## Case No. 4,088.

### DRISKELL v. PARISH.

[5 McLean, 64;[1] 7 West. Law J. 222.]

Circuit Court, D. Ohio. Nov. Term, 1849.

SLAVERY—ACTION FOR HINDERING AND OBSTRUCTING ARREST OF FUGITIVE — WHAT CONSTITUTES THE OFFENCE—HARBORING.

1. To sustain the allegation of hindering or obstructing the arrest of a fugitive from la-

---

[1] [Reported by Hon. John McLean, Circuit Justice.]

bor under the act of congress of February 12, 1793 [1 Stat. 302], some act of interference, on the part of the defendant, must be proved, tending to impair the right of recaption, secured by the statute.

2. The statute imposes no obligation on any one. to aid in the reception of such fugitive; and the penalties of the act of congress are not incurred, by one who is merely passive, in the attempt of the owner or his agent, to arrest the alleged fugitive.

3. An inquiry. made in good faith, as to the authority by which the arrest is sought to be made, is not a violation of the act of congress. Neither are the penalties of the act incurred by insisting that the person claimed as a fugitive shall have a fair trial, on the question, whether such person is a fugitive.

4. It is not necessary, to constitute a hindrance or obstruction, within the meaning of the act. that force or violence should be resorted to, to defeat the arrest.

5. The refusal to permit an arrest on the premises of another, after notice that the person sought to be arrested is a fugitive from labor, and a demand of permission to arrest such person, is a hindrance or obstruction.

6. The withdrawal or removal of the alleged fugitive, by the order or direction of another, so as to prevent an arrest, is a hindrance and obstruction.

7. The person seeking to make the arrest is under no obligation to commit a trespass, or breach of the peace, in carrying out his purpose to arrest.

8. Under the count for harboring or concealing. it must appear that the harboring or concealing was with the intention to elude the claim of the owner of the alleged fugitive.

9. A temporary shelter afforded to a fugitive, without any design to conceal him or her from the pursuit of the owner, or his agent, is not a harboring or concealing, within the meaning of the act.

LEAVITT, District Judge. This was an action in the case, brought [by Peter Driskell against Francis D. Parish] under the last clause of the act of congress of 1793. The allegations of the declaration are, in substance, that Jane Garretson and Harrison Garretson, being the slaves of plaintiff, residing in the state of Kentucky. escaped from his service into the state of Ohio—and, that the defendant hindered or obstructed the plaintiff's agent in the arrest of the slaves: also, that he harbored and concealed them, &c. The plea was, not guilty.

[For reports of former trials, see Cases Nos. 4,089 and 4,087.]

H. Stanbery and H. C. Noble, for plaintiff.
Judge Lane, T. Corwin, and J. W. Andrews, for defendant.

The evidence in behalf of the plaintiff, was as follows:

Col. Charles S. Mitchell. He states, that the persons named in the declaration were the slaves of the plaintiff, who resides in Mason county, in the state of Kentucky—that they were on his plantation in that county, in October, 1844, and that about that time, they disappeared, and have not been in the plaintiff's possession since. In February, 1845, witness was employed by plaintiff, under a written power of attorney for that purpose, to go in pursuit of the slaves, in company with A. J. Driskell, a son of the plaintiff. They reached Sandusky city, in the state of Ohio, the latter part of February, and ascertained that the two persons referred to, together with some other slaves, belonging to the same family, were in that place. About 12 o'clock, noon, they proceeded to the residence of the defendant—had passed the house a short distance, when they saw defendant coming out of the gate, opening from the front yard, into the street. The witness inquired of him, if two colored persons, Jane Garretson, and her little boy, Harrison, were at his house. Defendant said they were. Witness then asked if he could see them—to which defendant replied, he could, if they wished it. Defendant went into the house, and returned shortly after, with the woman; she standing near the defendant, on the front porch or portico, and witness and Driskell, being outside the gate, in the street. The woman recognized the witness and Driskell, and some conversation took place between them respecting the family of plaintiff. Witness then requested to see the boy, who was also brought out, and stood on the portico. He smiled, and seemed also to recognize Mitchell and Driskell, and was coming forward as if to shake hands with them. Mitchell said, "Let the little fellow come and shake hands with me;" but defendant interposed, saying it was not necessary to shake hands with the gentleman. Mitchell then stated to the defendant, that the woman and boy were the slaves of Peter Driskell, of Kentucky; that he was there, as his agent, to reclaim them; and that he demanded the privilege of arresting them. Defendant asked, by what authority—to which witness replied, "By a power of attorney;" at the same time putting his hand to his pocket, and offering to produce it. Defendant said, "You need not show it, as nothing but judicial authority will do;" saying also, that witness could not arrest the negroes there. He then, by a motion of his hand, directed the woman and boy to go into the house. They went in, and the defendant immediately followed them, shutting the door after him, and leaving witness and Driskell standing in the street. Witness never saw the slaves afterwards. Understood from defendant, in the course of the riot trial, that they left his house in the evening or night of the day on which the interview, mentioned by the witness, took place.

A. J. Driskell, also a witness for plaintiff, corroborated the statement of Mitchell, as to what occurred in front of defendant's house. He does not state the facts with the same minuteness as Mitchell, and differs with him, in this—that he states, the defendant pushed the woman and boy into the house, instead of directing them, by a motion of the hand, to go in.

Sarah Gustin says, she lived in the defendant's family, at the time of the occurrence testified to by Mitchell, and heard a part of the

conversation between him and defendant. Heard defendant say to Mitchell. he could not arrest the woman and boy, without lawful authority.

The evidence for the defendant, was substantially as follows:

A. H. Barber. Some two or three days after the interview between Col. Mitchell and defendant, referred to by Mitchell, there was a trial at the court house in Sandusky, on a charge for a riot, made against Mitchell and Driskell, and one Martin; that on this trial, the defendant, at the request of the counsel for the defendants in the riot case, was sworn as a witness; that he related, minutely, what took place in front of his house, between Mitchell and himself; admitting, that in that conversation he had said, he was a law-abiding man, and was only desirous that the colored persons should have a fair trial; but saying nothing of any demand to meet them; or, of any demand of lawful or judicial authority, to make the arrest; or of any refusal by defendant to permit the arrest. This statement, so made by the defendant, was assented to by Mitchell, with the exception that defendant had omitted to state the offer to shake hands with the boy, and the interference of defendant to prevent it. This witness further states, that on the trial of the riot case, Mitchell having observed, that he wished to set himself right before that community, by permission of the court, made a statement of what took place in front of defendant's house; which agreed, substantially, with that made by defendant on oath. Witness also says, that Mitchell stated, he had nothing to complain of, in reference to defendant's conduct, and that he had treated him like a gentleman. This was stated in a stage coach, as they were on the road from Sandusky to Columbus.

Judge Saddler. Was also present at the trial referred to by Mr. Barber. He corroborates Barber's statement. Says, that the defendant in giving testimony in the riot case, related what took place at defendant's gate. in front of his house; stating that when Mitchell informed him the colored woman and boy were fugitive slaves, and that he had come to take them, the defendant remarked, if he had any legal right to take them, he would not object, but would see that they had a fair trial. Witness understood this, as referring to the trial of the question, whether they were slaves—and supposed the only controversy between Mitchell and defendant was, the place where, and the person before whom, this trial should take place. After defendant had closed his statement, he asked Mitchell if it was correct—and Mitchell replied, it was, except that he had not stated what took place as to his offer to shake hands with the boy. In the course of the trial, Mitchell also made a statement of what took place at the gate,

in which witness did not understand him as having said anything about offering to produce authority to make the arrest, or as having made any demand to make the arrest. Mitchell admitted, that defendant had treated him like a gentleman.

Mr. Beecher. This witness stated with great minuteness what took place on the trial of the riot case, agreeing essentially with the statements of Mr. Barber and Judge Saddler.

The depositions of Z. W. Barker, C. S. Mackey, and John N. Sloane, were read by defendant's counsel. Their testimony related to what happened on the trial referred to, and was confirmatory of the statements of the preceding witnesses.

Col. Mitchell. In reply to the inquiry of counsel on that subject, says, he never has made any statement or admission of what took place at defendant's gate, varying in any essential particular from that made by him on this trial, and the preceding trials, between these parties. He now thinks, that the defendant's evidence, in the riot case, was not materially different from that which the witness now gives. Witness understood defendant's testimony on that occasion, as referring to the trial of the two boys, who had been arrested, and that what he said about a fair trial, related to them, and not to the woman and boy. Does not recollect that the matter of the offer to arrest the woman and boy, was in any way in controversy on the trial of the riot case. What he admitted, in regard to the fair conduct of defendant, related to the transaction at the gate, and not to any other matter in which defendant had an agency. Witness also says, that before leaving Sandusky city, he made arrangements with a view to a suit against the defendant for his interference with plaintiff's rights.

Mr. Wheeler. The deposition of this witness was read by the plaintiff. He was one of the counsel employed for the defendants in the riot case, and was present at the trial. His testimony is corroborative of that given by Mitchell. The counsel for plaintiff here offered evidence, tending to prove the active agency of the defendant in getting up, and carrying on the prosecution for the riot, before mentioned: also, a complaint for an assault and battery, in the arrest of the two boys—and an application for their discharge, by writ of habeas corpus, as showing the quo animo of defendant, in his interference with the offer to arrest the woman and the boy. This testimony was objected to, on the ground of its irrelevancy to the matters in issue in this suit.

THE COURT, referring to the fact, that this evidence had been held to be inadmissible, on a former trial between these parties, when Judge McLean was present, now overruled it.[2]

---

[2] [See Case No. 4,089.]

Judge LEAVITT stated to the jury the points of law arising in the case, in substance, as follows:

The constitution of the United States, in the second section of the fourth article, declares, that "no person held to service or labor in one state, under the laws thereof, escaping into another, shall, in consequence of any law or regulation therein, be discharged from such service or labor, but shall be delivered up, on claim of the party to whom such service or labor may be due." Under the power conferred by this provision, congress, on the 12th of February, 1793, passed the act, entitled, "An act respecting fugitives from justice, and persons escaping from the service of their masters." By the third section of this act, it is provided, that when any person held to labor in one state, shall escape into another, the person entitled to the labor or service of such person, may seize or arrest him or her, and convey him or her before any of the judicial officers designated, within the state in which the arrest was made, for the purpose of making proof that such fugitive owes service to the person setting up such claim, and obtaining a certificate to that effect. The fourth section provides, "that any person who shall knowingly and willingly obstruct, or hinder such claimant, his agent or attorney, in so seizing or arresting such fugitive from labor, or, shall rescue such fugitive from such claimant, &c.; or, shall harbor or conceal such person, after notice that he or she was a fugitive as aforesaid, shall, for either of the said offences, forfeit and pay the sum of five hundred dollars. Which penalty may be recovered, by and for the benefit of such claimant, by action of debt, in any court proper to try the same; saving, moreover, to the person claiming such service or labor, his right of action for or on account of the said injury, or either of them."

This action is brought under the last clause of the section just quoted. The declaration contains two counts: the first, for obstructing or hindering the arrest of the fugitives; the second, for harboring or concealing them. To sustain the first count, there must be evidence of some act of interference by the defendant, tending to impair the right of recaption, secured by the statute. No precise rule can be laid down, by which to determine what act shall constitute an obstruction or hindrance, within the prohibition of the statute. The right of arrest is conferred by the constitution and the act of 1793, in the most explicit terms, and without any express restriction or qualification. It may be inferred, that this power was thus conferred, in part, at least, from the consideration, that the arrest·is in the nature of a preliminary proceeding, and not conclusive of the rights of the suspected fugitive. When arrested, such person is to be conveyed, without any unreasonable delay, before some one of the judicial officers named in the statute, within

the state in which the arrest is made, for the purpose of a legal inquiry whether he or she is, in fact, a fugitive from labor. And, it is only by the exhibition of proof establishing the affirmative·of this inquiry, that the person arrested can be retained in custody, and removed to the state where "labor and service" are due. On failure to prove this fact, the person arrested is entitled to his discharge; and, it is presumed, would have a right of action against the person making the unlawful arrest, for damages. It may also be suggested, that there is a further security against a lawless and oppressive arrest, in the fact that by the statutes of many, if not all, the non-slaveholding states, the penalty of the crime of kidnapping is incurred by an unauthorized arrest of any one on pretence that such person is a fugitive from labor, and the attempt to convey him or her to a slaveholding state, to be held in servitude.

It is very clear, that the penalties provided by the act of congress, are not incurred by one who is merely passive, in the attempt of the owner, or his agent, to reclaim and arrest an alleged fugitive from labor. The statute imposes no obligation on any one to aid in the recaption. Under a law so penal in its character, it would be monstrous, by mere implication, to recognize such an obligation. Nor, will the mere inquiry, made in good faith, by what authority an arrest is sought to be made, bring a party within the prohibition of the statute. The penalty is denounced against any one, who "knowingly and willingly" obstructs or hinders an arrest. In the case of one, who has had no agency in the escape of the suspected fugitive, and is not to be presumed to be apprised of the fact, that the person is a fugitive from labor, and who has taken such person into his employment, or under his protection, without any improper intention, the penalty is not incurred, by merely inquiring into the authority to make the arrest. Such an inquiry, in the case supposed, would be entirely justifiable. Neither is it deemed to be a violation of the rights of the claimant, to insist that the alleged fugitive shall have a fair trial, upon the question, whether he or she owes "labor and service" to such claimant. On the other hand, it is clear the penalty of the statute may be incurred, without a resort to violence, in hindering or obstructing an arrest. Any act done, with the intention of defeating the arrest, and which tends to that result, is a violation of the rights of the claimant. If, after knowledge of the fact that a person is a fugitive, a demand is made to arrest on the premises of another, and refused, such refusal subjects the party to legal liability. An offer having been made to arrest, the party making it is under no obligation to commit either a trespass or a breach of the peace, in carrying his purpose into effect. The withdrawal or removal of the person of the alleged fugitive, by the order or direction of another, so

as to prevent an arrest, is also a hindrance and obstruction within the meaning of the statute.

Having stated these principles, as applicable to the count for obstructing and hindering the arrest, I will briefly notice the count for harboring or concealing. The learned judge, who presided in this court, on the trial of an action between these parties, brought to recover the specific penalty provided for by the statute, has held that "the words 'harbor' or 'conceal,' were not used in the statute as constituting two distinct offences, but as descriptive of one offence." And he has also held, that, "to harbor or conceal a fugitive from labor, within the meaning of the statute, it must be done with a view to elude the claim of the master." There can be no question, that this is the correct construction of the law. By the express words of the statute, to constitute the offence of harboring or concealing, there must be notice or knowledge, that the person harbored or concealed, is a fugitive from labor. This presupposes that there must be an intention to prevent a recaption. The intention therefore decides the character of the act. Hence the same eminent judge, in the case before referred to, says, "If a shelter be afforded to the fugitive, for an hour, a day, or a week, when there is manifestly no design to conceal him from the pursuit of the master or his agent, or in any way to defeat the legal right of the master to his service, there is no violation of the statute."

Keeping these principles in view, it is for the jury to decide, whether the defendant has harbored or concealed the fugitive, as alleged in the second count of the declaration. From the evidence, it does not appear, except as a matter of vague inference, that the defendant had knowledge that the woman and boy were slaves, till so informed by Col. Mitchell. And there would seem, therefore, to be no sufficient ground for assuming, that he had been guilty of any violation of the statute, prior to his obtaining such knowledge from Mitchell. It is insisted, however, that he harbored or concealed the fugitive, after being notified that they were slaves. The only proof in support of this position is, that the defendant said, the woman and boy left his house the evening following the interview between him and Col. Mitchell; having been informed by defendant, that they could remain no longer with him. If, from motives of humanity, the defendant permitted the fugitives to remain with him, for a short time, after notice of their real character, without any design thereby to elude the claim of the owner, he did not "harbor or conceal" them, within the contemplation of the statute.

It is strenuously contended by the counsel for the defendant, that the testimony of the witness Mitchell is unworthy of credit. Several intelligent witnesses have been called, who state in substance that on the examination which took place at the court house, in Sandusky, in reference to a charge for a riot, made against Mitchell and Driskell, and one Martin, the defendant was examined as a witness, and made a statement of the facts occurring at his gate, during the interview between him and Mitchell, varying in some essential particulars from the facts as stated by Mitchell, in his testimony in this case. To the correctness of the statement of the defendant, the witness Mitchell gave his assent. It also appears, from the testimony of the witnesses of the defendant, that Mitchell, on the same occasion, gave a narration of the facts occurring during the interview referred to, agreeing essentially with the statement of the defendant, then made, and in which there was an omission of some important facts, now stated. The credit due to witnesses belongs exclusively to the jury. It will be their duty to reconcile conflicting statements, in such a manner that, if possible, the whole may be regarded as consistent with truth and the integrity of the witnesses. But, if the statements of witnesses are so discrepant that they can not be thus made to harmonize, it will be for the jury to say where the truth lies.

I have now only to suggest, that although this action has originated in the existence of slavery in an adjoining state, the views of the jury, in relation to that subject in the abstract, should exert no influence in their conclusions as to the merits of this controversy. Like every other case tried in a court of justice, it should be decided according to the law and the evidence. If the plaintiff has suffered a wrong, for which the law gives him redress, it is the plain duty of the court and jury to aid him in obtaining that redress. It can not be disguised, that the subject of slavery is at this time a fruitful source of public agitation. Unfortunately, it has become a chief element of political excitement in our country. Whatever may be our individual views of this subject, it is clear, we shall best acquit ourselves of the responsibility now resting upon us, by taking care that the rights of the parties to this action are in no way affected by the existing state of public feeling, on the question of slavery. In Ohio, popular sentiment is no doubt strongly against that institution; and, there are few, if any, of her citizens who do not rejoice, that its admission into the state is precluded by a barrier, that may well be deemed insurmountable. Still, it may be taken for granted, that with very few exceptions, the citizens of that state are disposed readily to accord to the citizens of states in which slavery is tolerated by law, the rights solemnly guarantied to them by the constitution of the Union, and the laws passed in pursuance thereof. The act of 1793, under which the plaintiff has sought redress in this action, has been repeatedly brought to the notice of the supreme court of the United

States, and that tribunal—on such questions, the only authoritative one in the Union—has adjudged it to be a constitutional law. It can, therefore, only cease to be a law when repealed by the same authority by which it was enacted.

The jury returned a verdict for the plaintiff, on the count for hindering and obstructing the arrest—assessing the damages at $500, the proved value of the slaves in question, at the time of their escape. On the count for concealing and harboring, the verdict was for the defendant.

A motion was filed by the defendant for a new trial, which was overruled, and judgment entered on the verdict.

[NOTE. This case was afterwards heard on defendant's motion to retax the costs. See Cases Nos. 4,075 and 4,076.]